# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

JAMES HERBERT HUMMEL,

     Plaintiff,

                                   **Civil Action 2:16-cv-937**
                                   **Judge Algenon L. Marbley**
     v.                        **Magistrate Judge Elizabeth P. Deavers**

COMMISSIONER OF SOCIAL
SECURITY,

     Defendants.

## REPORT AND RECOMMENDATION

Plaintiff, James Herbert Hummel, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for supplemental security income benefits. This matter is before the Court for consideration of Plaintiff's Statement of Errors (ECF No. 12), the Commissioner's Memorandum in Opposition (ECF No. 17), Plaintiff's Reply (ECF No. 18), and the administrative record (ECF No. 11). For the reasons that follow, , the Undersigned **RECOMMENDS** that the Commissioner of Social Security's decision be **AFFIRMED** and Plaintiff's Statement of Errors be **OVERRULED**.

## I.     BACKGROUND

On June 11, 2014, Plaintiff protectively filed an application for supplemental security income. (R. at 215.) Plaintiff maintains that he became disabled on January 1, 2001, as a result of chronic obstructive pulmonary disease (COPD), degenerative disc disease, fibromyalgia, and a shoulder problem. (R. at 230.) Plaintiff's application was denied initially and upon

reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge ("ALJ"). (R. at 173.)

Plaintiff appeared and testified at the April 4, 2016, hearing, represented by counsel. (R. at 50-93.) A vocational expert also appeared and testified at the hearing. (R. at 85-91.) On May 20, 2015, ALJ Jeffrey Hartranft issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 25-34.) On June 3, 2016, Plaintiff filed a Request for Review of Hearing Decision Order. (R. at 17.) On July 27, 2016, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1–3.) Plaintiff then timely commenced the instant action.

## II. HEARING TESTIMONY

### A. Plaintiff's Testimony

Plaintiff testified at the administrative hearing that he is divorced and lives with his adult son. (R. at 57-58.) Plaintiff also testified that he does not currently have a driver's license because he is not comfortable driving while being treated with narcotic painkillers. (R. at 58.) Plaintiff stated that he has no hobbies due to his pain issues, although he used to play pool, golf, and go bowling. (R. at 82.)

Plaintiff stated that he is a high school graduate and that he used to work as a barber, although he does not currently have a barber's license. (*Id.*) According to Plaintiff, he gave up his barber's license two years before the administrative hearing because he did not feel that he was physically able to continue working as a barber. (R. at 58-59.) Plaintiff stated that he last worked as a barber in the 2013-2014, cutting hair approximately six hours per day, four days per week. (R. at 59.) Plaintiff testified that he stopped working after approximately eight months. (*Id.*) Plaintiff further testified that he worked as a barber at various shops from some time in

2

2005 anywhere from six to eight hours per day. (R. at 60-66.) According to Plaintiff, he was let go from multiple jobs because he missed too much work due to his physical ailments. (R. at 60, 62.) Plaintiff testified that he currently works for a cleaning company, doing light cleaning at a factory. (R. at 66.) Plaintiff stated, "I basically wipe fingerprints off the cubicles and use the dust bunny and that's about all I do." (*Id*.) According to Plaintiff, he can only work approximately seven hours per week because of his physical ailments. (R. at 67.)

Plaintiff testified that his "biggest problem" is sciatic nerve pain "that shoots down into my knees. It sort of feels like my knee, when it happens . . . like my knees are going to go out completely." (R. at 70.) Plaintiff also testified that for the last ten years he suffers from "[v]ery high pain levels" in his lower back and the back of his legs to the knees. (R. at 71.) Plaintiff further testified that, in addition to narcotics to manage his pain, he takes heart medication. (*Id*.) In Plaintiff's opinion, the narcotic pain drugs help his ability to work but also make him tired and sometimes make it difficult to breathe, especially when walking or going up and down stairs. (R. at 71-72.) Plaintiff testified that he suffers pain in his shoulders and that he has two pins in his right shoulder and one pin in his left shoulder because he had frequent shoulder dislocations as a child. (R. at 72.) Plaintiff also testified to painful bunions in both feet. (R. at 73.)

According to Plaintiff, "[i]t feels like someone's taking a hot knife 80% of my day and just stabbing me in the side" and lower back. (R. at 73.) Plaintiff testified that walking makes the pain worse and that he can only walk about half a block at a time. (*Id*.) Plaintiff also testified that he can stand for one hour before needing to sit and that he needs to sit for "a couple of hours" before standing again. (R. at 74.) Plaintiff further testified that lifting things makes his back hurt and he, therefore, does not lift anything heavier than a gallon of milk anymore. (R. at 74-75.)

Plaintiff testified that he can brush his teeth and feed himself. (R. at 75.) According to Plaintiff, his son does the grocery shopping because of his back and knee pain. (*Id*.) Plaintiff also testified that he sleeps in a reclining chair because lying in bed puts too much pressure on his lower back. (R. at 76.) Plaintiff further testified that after his back surgery two years prior, his pain medication no longer has the previous effect. (R. at 77.)

Plaintiff testified that he stopped drinking two years before the administrative hearing, but that he smoked marijuana once, approximately one year before the hearing. (R. at 78.) Plaintiff also testified that he used to use cocaine, but had not used for two and half years. (*Id*.) Plaintiff further testified that one of his previous providers stopped providing pain medication because Plaintiff took something that was not prescribed. (R. at 79.) Plaintiff stated that he had an overdose approximately five years before the administrative hearing when he took a non-prescribed Ambien with his prescribed Methadone. (R. at 83-84.) Plaintiff testified that he is not taking medication for depression, although he used to. (R. 84.) Plaintiff explained, "[i]t just made me feel really—just kind of spaced me out and I didn't like that." (*Id*.) Plaintiff said that he has never received counseling or seen a psychiatrist. (*Id*.)

Plaintiff stated that he had been under the care of several doctors for pain management and that he was dismissed from one treatment because he missed an injection appointment. (R. at 81.) Under that treatment program, Plaintiff received two Methadone 10s and one Percocet per day before transitioning to Vicodin and Methadone. (*Id*.) Plaintiff also reported that he has received physical therapy, heat and cold treatments, injection treatment, and "burning" of his nerves. (R. at 82.) According to Plaintiff, the nerve "burning" gives temporary relief for "a couple of weeks," but that the other treatments have little effect. (R. at 83.) Plaintiff stated that he also uses a TENS unit and a cane 8-10 times a month "when I'm having bad days." (R. at

83.)

**B.    Vocational Expert Testimony**

The vocational expert ("VE") testified at the administrative hearing that Plaintiff's past jobs include barber, a light exertion, skilled job and cleaner, a light exertion, unskilled job.  (R. at 85-86.)

The ALJ proposed a series of hypotheticals regarding Plaintiff's residual functional capacity ("RFC") to the VE.  (R. at 86-91.)  Based on Plaintiff's age, education, and work experience and the RFC ultimately determined by the ALJ, the VE testified that Plaintiff could perform his past jobs as a barber and cleaner.  (R. at 86.)

The VE also testified that if the hypothetical individual had additional limitations to work only at the sedentary level, he could still perform several jobs in the local and national economy, including table worker, circuit board assembler, and tube operator.  (R. at 87.)  The VE further testified that the job of cleaner could be performed without the sedentary restriction, but with the further restriction of working only in a structured environment where duties and goals are set by supervisors rather than independently.  (R. at 88.)

### III.    MEDICAL RECORDS

**A.  Marc E.W. Miller, Ph.D.**

On October 8, 2014, Plaintiff saw Marc E.W. Miller, Ph.D., an independent consultative examiner.  Plaintiff reported anxiety and depression over the prior couple of years due to his pain.  (R. at 422.)  Plaintiff told Dr. Miller that his son makes the meals, does laundry, cleaning, and grocery shopping, although Plaintiff manages his own finances.  (R. at 423.)  Plaintiff reported no mental health treatment.  (R. at 422.)  Dr. Miller observed "a great deal of pain behaviors," and noted a "rather blunted affect."  (R. at 422, 423.)  Plaintiff reported no use of

antidepressants, but Dr. Miller observed that he "appeared to be depressed." (R. at 423.)

Plaintiff told Dr. Miller, "I get depressed about all this pain and having MRSA. I don't have any

money. I worry about my future." (*Id*.) Dr. Miller noted that Plaintiff has fair concentration,

although he has difficulty staying on task, "possibly as a result of his pain." (*Id*.) According to

Dr. Miller, Plaintiff has good problem solving and moderate organizational abilities, and he can

follow two-step commands. (*Id*.) Dr. Miller made the following functional assessment:

> James abilities and limitations in regard to understanding, remembering, and carrying out one and two step job instructions indicate no difficulty.

> His abilities and limitations in regard to his interaction with co-workers, supervisors, and the public indicate no significant impairment. . . .

> James abilities and limitations in regard to maintaining attention span and concentration indicate some difficulty. This may be a result of his pain and anxiety.

> His abilities and limitations in regard to dealing with stress and pressure in a work setting indicate some issues. He does suffer from anxiety. However, no panic attacks are indicated. He is in a great deal of pain and this makes him irritable. He currently has difficulty dealing with people.

(R. at 425.) Dr. Miller diagnosed Plaintiff with moderate dysthymic disorder and moderate to

severe generalized anxiety disorder. (*Id*.)

**B. Cynthia Milich, CNP**

On January 27, 2015, Plaintiff saw Cynthia Milich, CNP, who recorded his complaints of

"constant" lower back pain. (R. at 549.) Plaintiff reported that the pain is alleviated by his

medications. (*Id*.) Plaintiff stated that he was not suffering from shortness of breath or chest

tightness. (*Id*.) Ms. Milich noted that Plaintiff displayed a "normal gait and normal station." (R.

at 550.) Ms. Milich also noted normal mood and affect. (*Id*.)

Plaintiff returned on February 10, 2015, complaining of back pain in his lumbar region,

which Plaintiff described as sharp, constant, burning pain that moderately limits his activities. (R. at 544.) Plaintiff stated that he was not suffering from shortness of breath or chest tightness. (*Id*.) Ms. Milich noted normal gait and station, as well as normal mood and affect. (R. at 546.)

Plaintiff saw Ms. Milich again on November 13, 2015, complaining of lower back pain in his lumbar region and on both sides, radiating into his left thigh and all the way to his right foot. (R. at 539.) Plaintiff described the pain as sharp, dull, throbbing, worsening, and aching, although alleviated by medications. (*Id*.) Plaintiff reported that activity triggers his pain. (*Id*.) Plaintiff stated that he was not suffering from shortness of breath or chest tightness. (*Id*.) Ms. Milich noted normal gait and station, as well as normal mood and affect. (R. at 546.)

Plaintiff saw Ms. Milich once more on February 1, 2016, complaining of continued lower back pain, radiating into his right buttock and all the way to his left foot, as well as numbness. (R. at 531.) Plaintiff described the pain as sharp, constant, worsening, and aching. (*Id*.) Plaintiff reported that he could still undertake weight bearing activity. (*Id*.) Plaintiff sought anxiety medication due to the death of a relative. (*Id*.) Nevertheless, Ms. Milich noted normal gait and station, as well as normal mood and affect. (R. at 532-533.)

## C. Ripal Parikh, DO

Plaintiff saw Dr. Ripal Parikh, DO, on December 28, 2015. Plaintiff reported very little relief from a 2015 L5 fusion surgery, injections, and physical therapy, but some relief from nerve "burning" procedures. (R. at 587.) Plaintiff complained of lumbar, foot, knee, shoulder, and thigh pain, as well as numbness and tingling in his back. (*Id*.) Plaintiff also reported pain when "standing, side-bending, twisting, bending forward, walking, lying down, climbing stairs, descending stairs, in midday and in the PM." (*Id*.) Plaintiff further reported that sitting and heat alleviate his pain. (*Id*.) Plaintiff told Dr. Parikh that sleeping in a recliner allowed him to get

about six hours of sleep.  (*Id.*)  Dr. Parikh noted that that Plaintiff displayed no signs of depression or anxiety.  (R. at 588.)

## D.  Mark E. Weaver, MD

On June 8, 2015, Plaintiff saw Mark E. Weaver, an independent consultative examiner. (R. at 433-437.)  Plaintiff reported constant and severe lower back pain, stiffness, and spasms radiating into one or both legs.  (R.at 433.)  Plaintiff reported using a TENS device and a back brace and stated that his symptoms are aggravated by cold and damp weather, increased physical activity, or prolonged positioning.  (*Id.*)  Plaintiff also reported that he is limited in ability to sit, stand, walk, lift, or carry.  (*Id.*)  Plaintiff further reported pain and stiffness in his left knee, with popping, cracking, and grinding sensations, which limits his standing, walking, use of stairs, squatting, stooping, crouching, kneeling, crawling, lifting, and carrying.  (*Id.*)  Plaintiff also complained of bunions that have been gradually increasing for ten years.  (*Id.*)  Plaintiff reported his COPD diagnosis and stated that he becomes short of breath after prolonged walking, climbing, use of stairs, lifting, and carrying.  (R. at 434.)

Dr. Weaver observed that Plaintiff walks "with a stiffened careful wide based gait and a slight left limp."  (R. at 434.)  According to Dr. Weaver, Plaintiff displayed shortness of breath without chest pain after walking forty feet up and down the clinic hallway.  (*Id.*)  On examination, however, Dr. Weaver found "regular and unlabored" respirations with "diffuse decreased breath sounds in all lung fields bilaterally with no wheezes, rales, or rhonchi."  (R. at 435.)  Dr. Weaver stated that manual muscle testing "showed ratchet inconsistency with pain inhibition and giving away in the left knee musculature, but was satisfactory in other muscle groups of the extremities."  (R. at 436.)  Dr. Weaver also recorded restricted active and passive motion with pain inhibition in Plaintiff's left knee.  (*Id.*)  He also noted "tenderness to palpation

diffusely on the left knee joint with crepitus to palpation in the joint without joint effusion or gross ligamentous laxity." (*Id.*) Plaintiff could perform only thirty percent of the normal squat test and needed to use the exam table to lift himself up, complaining of lower back and left knee pain. (*Id.*) Dr. Weaver noted "constant moderate involuntary spasm to inspection and palpation of the lumbar paravertebral muscles bilaterally and diffuse tenderness to palpation of the lower back." (*Id.*)

Dr. Weaver observed that Plaintiff displayed a "pleasant affect and an appropriate mood . . . . He was alert and oriented times three . . . . He was able to follow directions readily in the examination." (R. at 437.) Dr. Weaver opined that Plaintiff

> would probably be limited in the performance of physical activities involving sustained sitting, standing, walking, climbing, squatting, stooping, crouching, kneeling, crawling, lifting, and carrying. He would probably be able to perform physical activities involving handling objects, speaking, hearing, following directions, and travel.

(*Id.*)

**E. Coleene Cooke, MD**

On June 8, 2015, Plaintiff underwent x-rays of his left knee which showed no fracture or dislocation, no joint effusion, and minimal dorsal patellar spurring. (R. at 287.) Plaintiff also underwent x-rays of his right knee which showed no fracture or dislocation, no joint effusion, no acute abnormalities, and dorsal patellar spurring. (R. at 288.) X-rays of Plaintiff's lumbar spine revealed Scoliosis with associated arthritis and post-operative changes at L5-S1. (R. at 289.)

**F. David J. Alianiello, PT**

David J. Alianiello, PT, examined Plaintiff on April 12, 2016, as part of a functional capacity evaluation. (R. at 705.) Plaintiff self-reported being able to sit for 30 minutes at a time and stand for 20 minutes at a time. (*Id.*) Mr. Alianiello observed that Plaintiff walked at a slow

pace with no assistive devices, but was unable to perform a single-leg stand on either leg for more than five seconds at a time. (*Id*.) Mr. Alianiello noted that Plaintiff required initial instructions and occasional reminders throughout the evaluation. (R. at 706.) Mr. Alianiello also noted that Plaintiff could not reach overhead on his left side and could not lift from the floor or carry due to knee pain. (*Id*.) Mr. Alianiello opined that Plaintiff could occasionally bend and go up or down stairs, rarely squat, and never kneel, crawl, or use ladders. (*Id*.) Mr. Alianiello further opined that, "[f]unctionally, his symptoms interfered with his ability to perform consistent work-related activities even in a "Sedentary-Light" work category."

## G. Marita Moore, MD

On April 12, 2016, Marita Moore, MD, completed a questionnaire regarding Plaintiff's condition. (R. at 708-709.) Dr. Moore opined that Plaintiff's symptoms would frequently interfere with the attention and concentration required to perform simple work-related tasks. (R. at 708.) She also opined that Plaintiff would "need to recline or lied down during a hypothetical 8-hour workday in excess of the typical 15-minute break in the morning, the 30-60 minute lunch, and the typical 15-minute break in the afternoon." (*Id*.) Dr. Moore further opined that Plaintiff would need to take unscheduled breaks once or twice an hour for up to 10 minutes each time. (*Id*.) Dr. Moore also reported that Plaintiff would likely be absent from work more than four times per month due to his impairments or treatments. (R. at 709.) Dr. Moore indicated that Plaintiff can walk 1-2 city blocks without rest or significant pain and can sit for 4 total hours and stand or walk for 3 total hours in an 8-hour workday. (R. at 708) Dr. Moore stated that Plaintiff could carry ten pounds up to one-third of the workday and never carry twenty or more pounds. (*Id*.) Dr. Moore also stated that Plaintiff could use his hands to grasp turn, and twist objects 50-60% of the day; use his fingers to finely manipulate objects 50-60% of the day; and, use his arms

for reaching less than 25% of the day.  (*Id.*)

**H.  State Agency Evaluation**

On November 14, 2014, state agency physician, Steve E. McKee, M.D., reviewed the record and assessed Plaintiff's physical functioning capacity.  (R. at 127-130.)  Dr. McKee opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours in a workday; and sit for about six hours in a workday.  (R. at 128.)  Dr. McKee found that Plaintiff was unlimited in his ability to push and/or pull.  (*Id.*)  Dr. McKee also found that Plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, and crawl but could never climb ladders, ropes, or scaffolds.  (*Id.*)

On November 6, 2014, Karla Voyten, Ph.D., reviewed the record and assessed Plaintiff's mental functioning capacity.  (R. at 130-132.)  Dr. Voyten found Plaintiff to have sustained concentration and persistence limitations.  (R. at 130.)  She further found Plaintiff to have moderate limitation in his ability to maintain attention and concentration for extended periods of time and in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (R. at 130-131.)  Dr. Voyten found Plaintiff to be not significantly limited in other aspects of his ability to sustain concentration and persistence.  (*Id.*)  Dr. Voyten opined that Plaintiff "is able to perform work where breaks can be given every 2 hours."  (R. at 131.)  Dr. Voyten also found Plaintiff to have moderate limitations in his ability to respond appropriately to changes in the work setting.  (*Id.*)  In Dr. Voyten's opinion, Plaintiff can work in a "relatively static" work environment where "he is not expected to make plans or set goals in relation to work duties."  (*Id.*)

## IV. THE ADMINISTRATIVE DECISION

On May 20, 2016, the ALJ issued his decision. (R. at 25-34.) At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantially gainful activity since June 11, 2014, the application date.[2] (R. at 28.) The ALJ found that Plaintiff had the severe impairments of degenerative disc disease of the lumbar spince, arthritis of the knee, and history of hernia surgery. (R. at 28.) The ALJ determined that Plaintiff's dysthymic disorder, anxiety, and depression, considered singly and in combination, were non-severe impairments. (R. at 28-29) He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 29-30.) At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, [the ALJ finds] that the claimant has the residual functional capacity to perform light work as defined in 20 CFR

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

[2] Plaintiff previously applied for Social Security disability benefits in 2008 and received a final decision denying his application on January 21, 2011. The instant application covers the unadjudicated period subsequent to the 2011 final decision. (R. at 27.)

404.1567(b) and 416.967(b) except: he would be capable of frequent climbing of ramps or stairs but never climb ladders, ropes or scaffolds; he would be capable of frequent balancing, kneeling and crawling; and occasional stooping and crouching.

(R. at 30.)

In reaching this determination, the ALJ assigned "great weight" to the state agency medical consultant's opinion because they are well supported by imaging, physical examination findings, orthopedic treatment notes and, Plaintiff's reported activities of daily living. (R. at 32.) The ALJ assigned "little weight," however, to the state agency psychological consultants' opinions because they are inconsistent with mental status findings in the record, Plaintiff's lack of mental health treatment, and Plaintiff's activities of daily living that include work activity. (R. at 32.) The ALJ also assigned "little weight" to Dr. Weaver's opinion because it does not quantify Plaintiff's physical limitations and inconsistent with imaging, physical examination findings by treating sources, orthopedic treatment notes, and Plaintiff's reported activities of daily living. (*Id*.) The ALJ also discounted Dr. Weaver's opinion because it "relied quite heavily on the subjective report of symptoms and limitations provided by the claimant and seemed to uncritically accept as true most, if not all, of what the claimant reported." (*Id*.) The ALJ assigned "some weight" to Dr. Miller's opinion because his finding that Plaintiff has no difficulty understanding, remembering, and carrying out instructions and interacting with others is well-supported by other evidence in the record. (*Id*.) The ALJ found, however, that Dr. Miller's finding that Plaintiff has some difficulty maintaining attention and concentration and dealing with workplace stress is inconsistent with his mental status findings, Plaintiff's lack of mental health treatment, and Plaintiff's reported activities of daily living. (R. at 33.) The ALJ assigned "little weight" to Dr. Moore's opinion because it is inconsistent with Dr. Moore's own

observations, imaging, physical examination findings, orthopedic treatment notes, and Plaintiff's reported activities of daily living. (*Id.*) The ALJ also assigned Mr. Alianiello's opinion "little weight" because he is not an acceptable medical source pursuant to SSR 06-03P and because his opinion is inconsistent with imaging, physical examination findings, orthopedic treatment notes, and Plaintiff's reported activities of daily living. (*Id.*)

Relying on the VE's testimony, the ALJ concluded that Plaintiff can perform his past relevant work as a barber. (R. at 33.) He, therefore, concluded that Plaintiff was not disabled under the Social Security Act. (R. at 33-34.)

## VII. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VIII.  ANALYSIS

Plaintiff puts forward three assignments of error.  Plaintiff first contends that the ALJ erred by failing to properly evaluate the severity of Plaintiff's mental impairments at Step Two. (ECF No. 12 at 3.)  Plaintiff also argues that the ALJ erred by improperly weighing the opinions of examining physician Dr. Weaver and treating physician Dr. Moore.  (*Id*.)  Finally, Plaintiff contends that the ALJ's Step Four analysis is fatally flawed because his hypothetical question to the VE is based on an erroneous RFC constructed, at least in part, of mistakes set forth in Plaintiff's first two statements of error.  (*Id*.)

### A.  The ALJ Correctly Considered all of Plaintiff's Non-exertional Limitations

In his first assignment of error, Plaintiff argues that the ALJ erred by failing to properly evaluate the severity of Plaintiff's mental impairments at Step Two.  (*Id*.)  Specifically, Plaintiff maintains that it was error to find Plaintiff's impairments of dysthymic disorder, anxiety, and depression non-severe.  (*Id*. at 11.)  According to Plaintiff, by failing to label these impairments severe at Step Two, the ALJ failed to account for Plaintiff's mental limitations in his RFC

determination.  (*Id.*)

Where the ALJ determines that a claimant had a severe impairment at step two of the analysis, "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence."  *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803, (6th Cir. 2003).  Instead, the pertinent inquiry is whether the ALJ considered the "limiting effects of all [claimant's] impairment(s), even those that are not severe, in determining [the claimant's] residual functional capacity."  20 C.F.R. § 404.1545(e); *Pompa*, 73 F. App'x at 803 (rejecting the claimant's argument that the ALJ erred by finding that a number of her impairments were not severe where the ALJ determined that claimant had at least one severe impairment and considered all of the claimant's impairments in her RFC assessment); *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (same).

A review of the ALJ's RFC determination reveals that he considered all of Plaintiff's identified mental impairments.  The ALJ specifically addressed Dr. Miller's findings, which characterized Plaintiff as "cooperative and mannerly with good eye contact and normal psychomotor behavior.  Cognitively . . . alert and oriented with fair concentration, normal memory and average intelligence."  (R. at 32.)  The ALJ also discussed Dr. Miller's well-supported opinion that Plaintiff "has no difficulty with understanding, remembering and carrying out instructions and interacting with others."  (*Id.*)  The ALJ further acknowledges Dr. Miller's opinion that Plaintiff "has some issues and difficulty with maintaining attention and concentration and dealing with workplace stress," although the ALJ found it inconsistent with other evidence in the record and Dr. Miller's own mental status findings that record "normal cognitive functioning."  (R. at 32-33.)  The ALJ also noted Plaintiff's self-reported lack of mental health treatment during the period in question.  (*Id.*)  Further, the ALJ considered

Plaintiff's own testimony with respect to his activities of daily living, which indicate his self-employment as a barber during the relevant time period. (R. at 32-33.) In short, in making his RFC determination, the ALJ thoroughly considered the objective and subjective evidence of record regarding Plaintiff's non-exertional limitations. The Undersigned finds, therefore, that the ALJ considered all of Plaintiff's impairments in devising the RFC and did not err in finding Plaintiff's mental impairments non-severe at Step Two. *Pompa*, 73 F. App'x at 803.

**B.  The ALJ Properly Weighed Dr. Weaver and Dr. Moore's Opinion Evidence**

In his second assignment of error, Plaintiff argues that the ALJ erred by failing to give Dr. Weaver and Dr. Moore's treating physician opinions controlling weight. (ECF No. 12 at 15.) Specifically, Plaintiff contends that the ALJ's decision not to give Dr. Moore's opinion that Plaintiff's functional capacity is less than sedentary controlling weight is reversible error. Similarly, Plaintiff contends that it was error for the ALJ to reject Dr. Weaver's opinion that Plaintiff is limited in sustained sitting, standing, walking, climbing, squatting, stooping, crouching, kneeling, crawling, lifting, and carrying." (*Id*. at 17.) According to Plaintiff, the ALJ failed to give sufficient "good reasons" for rejecting these treating physician opinions, alleging that some are "inaccurate." (*Id*. at 15-18.)

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(c). The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these

sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ." 20 C.F.R. § 416.927(c)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id*. Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless

> some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128,
> 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating
> physician rule and permits meaningful review of the ALJ's application of the rule.
> *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 Fed. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242). There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

### 1. Dr. Moore

In his opinion, the ALJ notes that Dr. Moore is a treating physician. (R. at 33.) The ALJ found, however, that Dr. Moore's opinion limiting Plaintiff to work at less than sedentary range is "extreme." (*Id*.) Specifically, the ALJ explained that Dr. Moore's opinion is inconsistent with other substantial evidence in the record. Although Dr. Weaver found normal manipulative abilities, Dr. Moore opined that Plaintiff has manipulative limitations. (*Id*.; *see* R. at 436, 708.) The ALJ also noted that Dr. Moore's opinion is inconsistent with physical examination findings

by other treating sources, such as Dr. Weaver. (R. at 33.)  For example, Dr. Moore diagnosed Plaintiff with right knee pain, although Dr. Weaver diagnosed left knee pain.  (R. at 434, 437, 708.)  The ALJ also found Dr. Moore's opinions to conflict with objective medical evidence in the record.  Plaintiff's x-ray of his right knee revealed patellar spurs, but no fracture or dislocation, no joint effusion, and no acute abnormalities.  (R. at 288.)  Last, the ALJ points out that Plaintiff's own reported activities of daily living include testimony that he worked as a barber during the relevant period, which contradicts Dr. Moore's opinion evidence that Plaintiff cannot perform such activities.  (R. at 33, 59-65.)

### 2. Dr. Weaver

In his opinion, the ALJ also accorded Dr. Weaver's treating source opinion little weight. (R. at 32.)  In so doing, the ALJ clearly stated that he was rejecting Dr. Weaver's opinion, in part, because it is not supported by other, objective medical evidence, such as imaging results. Although x-rays of Plaintiff's knees were normal, other than patellar spurring in both, Dr. Weaver diagnosed Plaintiff with "probable chronic left knee pain possible degenerative arthritis."  (R. at 287-288, 437.)   The ALJ explained that he rejected some of Dr. Weaver's limitations because his findings were "vague" and couched in probabilistic terms like "would probably."  (R. at 32, 437.)   Furthermore, as the ALJ points out, Dr. Weaver's observations and conclusions conflict with other evidence in the record, including, as described above, Dr. Moore's examination of Plaintiff's knees.  Additionally, Dr. Weaver based his limitations, in part, on "probable chronic shortness of breath COPD," although he found on examination "regular and unlabored" breathing and "diffuse decreased breath sounds in all lung fields bilaterally with no wheezes, rales, or rhonchi."  (R. at 28, 435.)  As with Dr. Moore, Dr. Weaver's opinion also conflicts with Plaintiff's own testimony with respect to his activities of

daily living, including his work as a barber during the relevant period.  (R. at 32, 59-65.)

Because of these well-documented contradictions between Dr. Weaver's opinion evidence and

the other substantial subjective and objective evidence in the record, it is not necessary to find, as

the ALJ did, that Dr. Weaver relied overmuch on Plaintiff's subjective report of symptoms.  (R.

at 32.)  Nevertheless, the Undersigned notes that Dr. Weaver's opined limitations were markedly

more severe than any other opinion source, which tends to support the ALJ's reason-giving.

For the reasons explained above, the Undersigned finds the ALJ properly gave good

reasons for the weight assigned to Plaintiff's treating source opinion evidence, and those reasons

are supported by substantial evidence in the record.[3]  *Friend*, 375 F. App'x at 550.

## VII.  CONCLUSION

In conclusion, from a review of the record as a whole, the Court concludes that

substantial evidence supports the ALJ's decision denying benefits.  Accordingly, the

Undersigned **RECOMMENDS** that the Commissioner of Social Security's decision be

**AFFIRMED** and Plaintiff's Statement of Errors be **OVERRULED**.

---

[3] Plaintiff's third statement of error is predicated upon the existence of errors at Step Two and in the ALJ's RFC determination.  Because the Undersigned finds that the ALJ did not commit error at these steps, Plaintiff's third statement of error is necessarily without merit and need not be addressed.  (ECF No. 12 at 3.)  In any event, the Undersigned finds that the ALJ's hypothetical question incorporated all of the limitations the ALJ found credible and supported by the evidence and, therefore, was proper.  In formulating the hypothetical, an ALJ is only "required to incorporate those limitations accepted as credible by the finder of fact."  *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).  Here, Plaintiff in effect restates his previous arguments and fails to identify other evidence supporting additional RFC restrictions that the ALJ found credible.  Accordingly, the ALJ did not err in relying on the VE's testimony.

## PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date:  January 9, 2018                              ____*/s/ Elizabeth A. Preston Deavers*____
                                                    ELIZABETH A. PRESTON DEAVERS
                                                    UNITED STATES MAGISTRATE JUDGE